**14 CV    5671**

Andrew J. Warner (AW-5534)
HILL RIVKINS LLP
Attorneys for Plaintiff
45 Broadway, Suite 1500
New York, New York 10006
Tele: (212) 669-0600

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————

THE RICE CORPORATION, a Delaware
corporation d/b/a THE RICE COMPANY USA,

          Plaintiff,

    vs.

EXPRESS SEA TRANSPORT CORPORATION,
CAPITAL PRODUCT PARTNERS LP,
CAPITAL SHIP MANAGEMENT CORP., and
CAPITAL SHIP MANAGEMENT (USA) CORP.

          Defendants.

———————————————————

Case No.:

**COMPLAINT**

RECEIVED
JUL 24 2014
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

Plaintiff The Rice Corporation d/b/a The Rice Company USA (hereinafter referred to as "TRC"), by its attorneys, Hill Rivkins LLP, bring this action defined below and for their Complaint allege, pursuant to their own knowledge, or where there is no personal knowledge, upon the investigation of counsel and/or upon information and belief, to wit:

### NATURE OF CASE

1.    On or about April 4, 2007, TRC, as charterer, and Express Sea Transport Corporation (hereinafter referred to as "ESTC"), as disponent owner, entered into a time charter party for the charter of the M/V APOSTOLOS II for a period of between 11 and 13 months.

1

Disputes arose under the subject charter party regarding receipt of hire payments and ESTC's wrongful withdrawal of the vessel from service prior to the termination of the charter period.

2.     In accordance with the terms of the charter party, on or about July 17, 2007, TRC demanded arbitration in London and ESTC retained attorneys, named an arbitrator and participated in the arbitration.

3.     During the pendency of the arbitration, on or about April 8, 2009, ESTC's attorneys in London offered to settle the claim through a payment of US$1,275,000.00 to TRC. A dispute thereafter arose as to whether TRC's acceptance of the offer was timely.   The arbitration panel was thereupon asked to decide whether a binding settlement agreement had been arrived at by the parties.   By an award dated September 23, 2010, the arbitration panel found that the offer of ESTC had been validly accepted.   Attached hereto as Exhibit A is a true and accurate copy of the award issued by the arbitration panel in London in favor of TRC and against ESTC on September 23, 2010 for the settlement amount of US$1,275,000.00.

4.     Because of the failure of ESTC to pay the settlement, TRC was forced to commence an action in the High Court of Justice to enforce the award.   Attached hereto as Exhibit B are true and correct copies of the Claim Form and Witness Statement of James Charles King, TRC's London solicitor, which were filed in the High Court of Justice, Queen's Bench Division, Commercial Court Registry in London, England.

5.     On September 23, 2011, the High Court of Justice, Queen's Bench Division, Commercial Court Registry entered an order permitting TRC to enforce the award in the same manner as a judgment or order to the same effect.   Attached hereto as Exhibit C is a true and correct copy of the Order entered by the High Court of Justice, Queen's Bench Division, Commercial Court Registry, London, England.

6.       Pursuant to the Order issued by the High Court of Justice, Queen's Bench Division, Commercial Court Registry, defendant ESTC is obligated to pay TRC $1,275,000.00.

7.       The Order issued by the High Court of Justice, Queen's Bench Division, Commercial Court Registry is a final judgment, conclusive and enforceable in England.

8.       TRC, having obtained a Judgment against ESTC in the High Court of Justice, Queen's Bench Division, Commercial Court Registry, sought confirmation of the Judgment by this Court.

9.       As a result, the judgment was confirmed in the United States District Court for the Southern District of New York. A copy of the Judgment is attached as Exhibit D.

10.     To date, ESTC has failed to pay any of the moneys owed to TRC.

11.     Defendants constitute a sophisticated, integrated and interrelated international enterprise that was, at all material times, centrally controlled by a common set of officers, directors, and managers, including but not limited to Mr. Evangelos M. Marinakis, and Mr. Ioannis E. Lazaridis. Marinakis and Lazaridis, through their positions as an officer, director, shareholder, or manager of the Defendant entities, sit at the epicenter of the centralized management and operation of the Defendants' businesses where they exert direct control over the Defendants' day-to-day operations. Since all roads lead to Marinakis and Lazaridis and the constellation of entities which they control, Plaintiff seeks to impose alter ego liability, and/or to pierce the corporate veil of certain corporate entities to hold Marinakis and Lazaridis liable, or to hold Marinakis and Lazaridis jointly and severally liable for action or inaction by the corporate entities that they control.

## JURISDICTION AND VENUE

12.     This is a case within the Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333, and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure arising out of the enforcement of a settlement agreement. This Court also has jurisdiction pursuant to 28 U.S.C. §1332 in that the matter in controversy involves citizens of a state and citizens of a foreign state and exceeds the sum of $75,000.00, exclusive of interests and costs. Venue is proper in that this Court recognized the High Court of England's judgment against ESTC.

13.     ESTC is a foreign corporation regularly doing business in New York, and accordingly, ESTC is subject to jurisdiction under C.P.L.R. 302(a)

14.     Defendants are individuals and/or corporate entities, including a possessor of Funds owed to Plaintiff  who, upon information and belief, have either (i) received, possessed, acquired, sold, appropriated, or converted any property and/or money which rightfully belongs to Plaintiff, or (ii) assisted Defendant ESTC in carrying out its scheme to defraud Plaintiff of the moneys owed to it which rightfully loot assets property and/or money which rightfully belongs to Plaintiff, and who: (i) are domiciled in New York, (ii) transact any business within the state or contract anywhere to supply goods or services in the state, (iii) entered into contracts within the state, (iv) breached contracts within the state, (v) performed or refused to perform services in the state, (vi) committed a tortious act within the state, (vii) committed a tortious act within the state causing injury to person or property within the state, and (a) regularly do or solicit business, or engage in any other persistent course of conduct, or derive substantial revenue from goods used or consumed or services rendered, in the state, or (b) expect or should reasonably expect the act

to have consequences in the state and derive substantial revenue from interstate or international commerce, or (v) owns, uses or possesses any real property situated within the state.

15.     This action is brought within any applicable statutes of limitations, and to the extent that any statute of limitations might otherwise apply, the facts set forth herein warrant equitable tolling of such limitations periods.

## THE PARTIES

16.     At all times hereinafter mentioned, Plaintiff, TRC, was, and now is, a corporation or other business entity duly organized and existing under and by virtue of the laws of Delaware, with an office and principal place of business in Roseville, California.

17.     Upon information and belief, at all times hereinafter mentioned, defendant Express Sea Transport Corporation ("ESTC"), was, and now is, a corporation or other business entity duly organized and existing under and by virtue of the laws of Panama and Greece.

18.     Upon information and belief, at all times hereinafter mentioned, defendant Capital Product Partners LP ("CPPLP"), was, and now is, a corporation or other business entity duly organized and existing under and by virtue of the laws of a foreign country.

19.     The defendant CPPLP is an alter-ego of ESTC as pled in further detail herein.

20.     Upon information and belief, at all times hereinafter mentioned, defendant Capital Ship Management Corp. ("CSM") was, and now is, a corporation or other business entity duly organized and existing under and by virtue of the laws of a foreign country.

21.     The defendant CSM is an alter-ego of ESTC as pled in further detail herein.

22.     Upon information and belief, at all times hereinafter mentioned, defendant Capital Ship Management (USA) Corp.  ("CSM-USA"), was, and now is, a corporation or other business entity duly organized and existing under and by virtue of the laws of Delaware.

23.     The defendant CSM-USA is an alter-ego of ESTC as pled in further detail herein.

## ALLEGATIONS RELEVANT TO ALL CLAIMS

24.     On or about April 4, 2007, TRC, as charterer, and, as disponent owner, entered into a time charter party for the charter of the M/V APOSTOLOS II for a period of between 11 and 13 months.  Disputes arose under the subject charter party regarding receipt of hire payments and ESTC's wrongful withdrawal of the vessel from service prior to the termination of the charter period.

25.     In accordance with the terms of the charter party, on or about July 17, 2007, TRC demanded arbitration in London and ESTC retained attorneys, named an arbitrator and participated in the arbitration.

26.     During the pendency of the arbitration, on or about April 8, 2009, ESTC's attorneys in London offered to settle the claim through a payment of US$1,275,000.00 to TRC.  A dispute thereafter arose as to whether TRC's acceptance of the offer was timely.   The arbitration panel was thereupon asked to decide whether a binding settlement agreement had been arrived at by the parties.  By an award dated September 23, 2010, the arbitration panel found that the offer of ESTC had been validly accepted and awarded Plaintiff same.

27.     Because of the failure of ESTC to pay the settlement, TRC was forced to commence an action in the High Court of Justice to enforce the award.

28.     On September 23, 2011, the High Court of Justice, Queen's Bench Division, Commercial Court Registry entered an order permitting TRC to enforce the award in the same manner as a judgment or order to the same effect.

29.     Pursuant to the Order issued by the High Court of Justice, Queen's Bench Division, Commercial Court Registry, defendant ESTC is obligated to pay TRC $1,275,000.00.

30.     The Order issued by the High Court of Justice, Queen's Bench Division, Commercial Court Registry is a final judgment, conclusive and enforceable in England.

31.     TRC, having obtained a Judgment against ESTC in the High Court of Justice, Queen's Bench Division, Commercial Court Registry, sought confirmation of the Judgment by this Court.

32.     As a result, the judgment was confirmed in the United States District Court for the Southern District of New York. To date, ESTC has failed to pay any of the moneys owed to TRC.

33.     Defendants constitute a sophisticated, integrated and interrelated international enterprise that was, at all material times, centrally controlled by a common set of officers, directors, and managers, including but not limited to Mr. Evangelos M. Marinakis, and Mr. Ioannis E. Lazaridis. Marinakis and Lazaridis, through their positions as an officer, director, shareholder, or manager of the Defendants' entities, sit at the epicenter of the centralized management and operation of the Defendants' businesses where they exert direct control over the Defendants' day-to-day operations. Since all roads lead to Marinakis and Lazaridis and the constellation of entities which they control, Plaintiff seeks to impose alter ego liability, and/or to pierce the corporate veil of certain corporate entities to hold Marinakis and Lazaridis liable, or to hold Marinakis and Lazaridis jointly and severally liable for action or inaction by the corporate entities that they control.

## CAUSES OF ACTION
## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

34.     Plaintiff repeats and re-alleges each of the foregoing allegations as if fully set forth herein.

35.     On or about April 4, 2007, TRC, as charterer, and ESTC, as disponent owner, entered into a time charter party for the charter of the M/V APOSTOLOS II for a period of between 11 and 13 months.  Disputes arose under the subject charter party regarding receipt of hire payments and ESTC's wrongful withdrawal of the vessel from service prior to the termination of the charter period.

36.     In accordance with the terms of the charter party, on or about July 17, 2007, TRC demanded arbitration in London and ESTC retained attorneys, named an arbitrator and participated in the arbitration.

37.     During the pendency of the arbitration, on or about April 8, 2009, ESTC's attorneys in London offered to settle the claim through a payment of US$1,275,000.00 to TRC. A dispute thereafter arose as to whether TRC's acceptance of the offer was timely.  The arbitration panel was thereupon asked to decide whether a binding settlement agreement had been arrived at by the parties.  By an award dated September 23, 2010, the arbitration panel found that the offer of ESTC had been validly accepted.  TRC was issued an award by the arbitration panel in London on September 23, 2010 for the settlement amount of US$1,275,000.00.

38.     ESTC failed to pay the settlement and TRC was forced to commence an action in the High Court of Justice to enforce the award.

39.     On September 23, 2011, the High Court of Justice, Queen's Bench Division, Commercial Court Registry entered an order permitting TRC to enforce the award in the same manner as a judgment or order to the same effect.

40.     Pursuant to the Order issued by the High Court of Justice, Queen's Bench Division, Commercial Court Registry, defendant ESTC is obligated to pay TRC $1,275,000.00.

41.     The Order issued by the High Court of Justice, Queen's Bench Division, Commercial Court Registry is a final judgment, conclusive and enforceable in England.

42.     TRC, having obtained a Judgment against ESTC in the High Court of Justice, Queen's Bench Division, Commercial Court Registry, sought confirmation of the Judgment by this Court.

43.     As a result, the judgment was confirmed in the United States District Court for the Southern District of New York.

44.     To date, ESTC has failed to pay any of the moneys owed to TRC, breaching not only the settlement agreement, but defying multiple court and arbitration awards.

45.     As a proximate result of Defendant's breach of contract of the Settlement Agreement, Plaintiff has sustained damages in an amount to be determined at trial, plus interest commencing at 30 days following the breach at New York's 9% statutory rate.

## SECOND CLAIM FOR RELIEF

### (Account Stated)

46.     Plaintiff repeats and re-alleges each of the foregoing allegations as if fully set forth herein.

47.     On or about April 4, 2007, TRC, as charterer, and ESTC, as disponent owner, entered into a time charter party for the charter of the M/V APOSTOLOS II for a period of

between 11 and 13 months.  Disputes arose under the subject charter party regarding receipt of hire payments and ESTC's wrongful withdrawal of the vessel from service prior to the termination of the charter period.

48.     In accordance with the terms of the charter party, on or about July 17, 2007, TRC demanded arbitration in London and ESTC retained attorneys, named an arbitrator and participated in the arbitration.

49.     During the pendency of the arbitration, on or about April 8, 2009, ESTC's attorneys in London offered to settle the claim through a payment of US$1,275,000.00 to TRC. A dispute thereafter arose as to whether TRC's acceptance of the offer was timely.  The arbitration panel was thereupon asked to decide whether a binding settlement agreement had been arrived at by the parties.  By an award dated September 23, 2010, the arbitration panel found that the offer of ESTC had been validly accepted.  TRC was issued an award by the arbitration panel in London on September 23, 2010 for the settlement amount of US$1,275,000.00.

50.     ESTC failed to pay the settlement and TRC was forced to commence an action in the High Court of Justice to enforce the award.

51.     On September 23, 2011, the High Court of Justice, Queen's Bench Division, Commercial Court Registry entered an order permitting TRC to enforce the award in the same manner as a judgment or order to the same effect.

52.     Pursuant to the Order issued by the High Court of Justice, Queen's Bench Division, Commercial Court Registry, defendant ESTC is obligated to pay TRC $1,275,000.00.

53.     The Order issued by the High Court of Justice, Queen's Bench Division, Commercial Court Registry is a final judgment, conclusive and enforceable in England.

54.    TRC, having obtained a Judgment against ESTC in the High Court of Justice, Queen's Bench Division, Commercial Court Registry, sought confirmation of the Judgment by this Court.

55.    As a result, the judgment was confirmed in the United States District Court for the Southern District of New York.

56.    To date, ESTC has failed to pay any of the moneys owed to TRC, breaching not only the settlement agreement, but defying multiple court and arbitration awards.

57.    As a proximate result of ESTC's breach of contract of the Settlement Agreement, Plaintiff has sustained damages in an amount to be determined at trial, plus interest commencing at 30 days following the breach at New York's 9% statutory rate.

58.    Despite any objections by ESTC as to whether the settlement was timely accepted, multiple courts have upheld the settlement agreement. They have not disputed that the money is actually owed, but rather that the settlement agreement was not properly accepted.

59.    Plaintiffs have sent multiple invoices and correspondences to ESTC, but ESTC has failed and refused to pay accordingly.

60.    By reason of the foregoing, ESTC is liable to Plaintiff for an amount to be determined at trial, plus interest commencing at 30 days following the breach at New York's 9% statutory rate.

## THIRD CLAIM FOR RELIEF

### (Unjust Enrichment)

61.     Plaintiff repeats and re-alleges each of the foregoing allegations as if fully set forth herein.

62.     Plaintiff upheld its end of the contract by performing the duties stated under it. Issues relating to the contract later arose and Defendant agreed to compensate Plaintiff accordingly through a settlement agreement.

63.     As set forth above, Defendants engaged in a wrongful scheme by failing to pay the settlement funds and improperly funding a corporation and/or defunding ESTC to deprive Plaintiff the amount owed under the settlement agreement and the ensuing awards through pattern of deception and over-reaching.

64.     Under the circumstances, it would be unfair and would unjustly enrich Defendants to allow Defendant to funnel ESTC money into parent corporations and/or to individual owners to avoid payment under the settlement agreement.

65.     Accordingly, Plaintiff respectfully requests the ability to pursue ESTC's owners and parent corporations.

## FOURTH CLAIM FOR RELIEF

### (That Defendants CPPLP, CSM, and CSM-USA Are Liable For The Breach Of The Maritime Contract As Alter-Egos Of Defendant ESTC)

66.     Plaintiff repeats and re-alleges each of the foregoing allegations as if fully set forth herein.

67.     Plaintiff alleges upon information and belief that defendants CPPLP, CSM, and CSM-USA are liable as the alter-egos of defendant ESTC.

68.    At all material times, there existed such unity of ownership and interest between ESTC and defendants CPPLP, CSM, and CSM-USA that no separation existed between them, and the corporate form of defendants CPPLP, CSM, and CSM-USA has been disregarded such that ESTC primarily transacted the business of CPPLP, CSM, and CSM-USA, and, therefore they are alter-egos of each other or vice versa.

69.    At all material times, defendant ESTC and defendants CPPLP, CSM, and CSM-USA have or had overlapping ownership, management, personnel and purposes such that defendants ESTC, CPPLP, CSM, and CSM-USA did not and do not operate at arm's length.

70.    Upon information and belief, defendants ESTC, CPPLP, CSM, and CSM-USA have had common addresses and common contact information such that defendants CPPLP, CSM, and CSM-USA have no independent corporate identity from defendant ESTC.

71.    At all material times, there has been an intermingling of funds between defendants ESTC, CPPLP, CSM, and CSM-USA.

72.    At all material times, defendants CPPLP, CSM, and CSM-USA have dominated, controlled and/or used ESTC for their own purposes such that there is no meaningful difference between the several entities, or vice versa.

73.    As such, there are reasonable grounds to conclude that defendants CPPLP, CSM, and CSM-USA are the alter-egos of defendant ESTC and, therefore, plaintiff TRC has a valid prima facie *in personam* claim against defendants CPPLP, CSM, and CSM-USA based up on alter-ego liability.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for judgment against Defendant ESTC and/or defendants CPPLP, CSM, and CSM-USA as follows:

(a) Judgment in an amount to be determined at trial including compensatory and punitive damages;

(b) Pre- and post-judgment interest, to the fullest extent assessable at law or in equity, on all amount of damages;

(c) Reasonable attorney fees, costs, and expenses; and

(d) For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
      July 24, 2014

                         HILL RIVKINS LLP
                         Attorneys for Plaintiff,
                         The Rice Company USA

By: _____
                         Andrew J. Warner
                         45 Broadway, Suite 1500
                         New York, NY 10006
                         Tele: 212-669-0600

Exhibit A

# J.C. Sheppard

**MA Jurisprudence (Oxon)**
**LMAA Arbitrator**

43 Park Road
Chiswick
London W4 3EY
United Kingdom



**L.M.A.A.**

Telephone: +44 (0) 20 8994 0800
Facsimile: +44 (0) 20 8742 0649
Mobile: 0771 368 0663
e-mail: jcsheppard@btconnect.com

## FAX MESSAGE

Date: Tuesday, 05 October 2010                        No. of Pages :1

TO:        Winter Scott
Attn:      James King
Ref:       unknown
Fax:       020 7726 2371

TO:        Reed Smith
Attn:      Charles Weller; Sarah Rogers
Ref:       unknown
Fax:       020 3116 3999

CC:        Robert Gaisford
Fax.:      01580 201124

CC:        Alec Kazantzis
Fax:       020 7221 0912

---

Re :        "Apostolos II"      - C/p 04-04-2007

---

Dear Sirs,

Further to my email of 4 October 2010, £18,940 having been now received I attach the Award and Reasons. A hard copy will be posted tomorrow.

Kind regards,

J.C. Sheppard

1

<u>IN MATTER OF THE ARBITRATION ACT 1996</u>

<u>AND</u>

<u>IN THE MATTER OF AN ARBITRATION</u>

<u>BETWEEN:</u>


### THE RICE COMPANY USA

CLAIMANTS
(CHARTERERS)


### AND


### EXPRESS SEA TRANSPORT CORP

RESPONDENTS
(OWNERS)


### m.v. "APOSTOLOS II"

### (CHARTERPARTY DATED 4th APRIL 2007)

---

### AWARD AS TO JURISDICTION AND ON THE MERITS PURSUANT TO s.31(4)(b) OF THE ARBITRATION ACT 1996

---

## MV. "APOSTOLOS II"

### (CHARTERPARTY DATED 4 APRIL 2007)

# R E A S O N S

**THESE REASONS FORM PART OF AND SHOULD BE READ IN CONJUNCTION WITH THE AWARD IN THIS REFERENCE**

## Introduction

(1)   In this reference, The Rice Company USA ("Charterers") seek an award against Express Sea Transport Corp ("Owners") confirming that Owners are to pay Charterers US$1,275,000.00 with interest thereon and the Charterers' recoverable costs incurred in an arbitration reference between them. Charterers claim these sums are due following an agreement reached by an exchange of emails between the London solicitors representing the parties dated 8 and 29 April 2009 ("the Settlement Agreement").

(2)   Charterers maintain that the tribunal established for the purpose of determining the original dispute between the parties to the charterparty between them dated 4 April 2007 ("the charter") – with the addition of a third arbitrator – has jurisdiction to determine this claim by Charterers. Owners first, contest the tribunal's jurisdiction to grant the relief sought by Charterers, and second, deny that any such settlement agreement was reached as claimed, the Owners saying that their offer to settle the dispute had lapsed before it was accepted by Charterers.

(3)   These Reasons deal first with the challenge to the tribunal's jurisdiction; second with the substantive issue of whether a settlement agreement was reached; and third with liability for costs up to and following the alleged Settlement Agreement.

1

**Challenge to jurisdiction**

(4)   The offer by Owners was contained in an email from their London solicitors, Reed Smith ("RS"), to Charterers' London solicitors Winter Scott ("WS") dated 8 April 2009. This stated, *inter alia:-*

> "*WITHOUT PREJUDICE SAVE AS TO COSTS*
>
> *We refer to previous correspondence, and to your fax of 2 April with TRC's offer to settle for US$1,600,000. This offer is rejected.*
>
> *We have taken further instructions, however, and ESTC is prepared to repeat its previous offer of 20 March, and remains willing to pay US$1,275,000 as a net settlement of all claims and counter-claims in this reference, in resolution of all matters in dispute between the parties.*
>
> *This offer is on the same terms as ESTC's previous offer, and is intended to have the consequences of a Part 36 offer. For the avoidance of doubt, in addition to the principal of US$1,275,00, ESTC is willing to pay interest thereon and TRC's recoverable costs in the arbitration, with both interest and costs to be assessed by the Tribunal if not agreed between the parties.*
>
> *...*
>
> *This offer is open for 21 days, until Wednesday 29 April 2009, and shall therefore lapse at close of business London time that day unless it is withdrawn sooner."*

(5)   On 29 April 2009, the last day the offer was open, at 14:57 James King of WS emailed Thomas Meadows of RS:-

> "*Without prejudice save as to costs*
>
> *Dear Tom*
>
> *I refer to our pleasant telephone conversation yesterday, and look forward to hearing from you as soon as possible.*
>
> *As discussed, given that your Clients' offer expires today, I should be grateful if you would confirm a short extension of time (say, 7 days) to that offer, while you await your Clients' instructions."*

2

(6)   At 17:01 that day Mr Meadows emailed Mr King:-

> "*Without prejudice save as to costs*
>
> *Dear James*
>
> *We refer to your email below and to our recent telephone conversation. We confirm that we do not have instructions to extend the terms of our client's last offer beyond the deadline for acceptance today.*
>
> *We note that you will be taking further instructions from your clients, adn we look forward to hearing from you.*"

(7)   Upon receipt of this email Mr King emailed back to Mr Meadows at 17:21 on 2 April 2009:-

> "*Dear Tom*
>
> *Thank you for your email. I note with regret that your Clients did not provide you with instructions to extend the validity of the offer, by even a short period, to enable our discussions regarding the timing of payment to continue.*
>
> *In the circumstances, my Clients hereby accept the offer contained in your fax of 8 April 2009 (which repeated the offer contained in your fax of 20 March).*
>
> *I will write to you separately with details of the account to which the settlement funds should be remitted, and in the meantime should be grateful if you would check with your Clients as to the earliest date by which they can make payment. In this regard, your Clients' offer is expressed to have the consequences of a Part 36 offer, and under Part 36.11(6), payment must be made within 14 days of acceptance.*"

(8)   The following day W.S. emailed a spreadsheet to RS showing the total principal and interest due on the assumption that payment was made on 8 May 2009 – a figure of US$1,409,092.38 – also showing interest accruing daily for every day after 8 May 2009. Also on 30 April 2009 WS faxed the two arbitrators appointed:-

> "*We refer to previous correspondence, and are pleased to advise the Tribunal that the parties have now settled this matter amicably.*

3

*As part of that settlement, we should be grateful if the Tribunal would address their Final Invoices in respect of any unbilled interlocutory charges to Reed Smith's Clients.*

*We would like to take the opportunity to thank the Tribunal for their assistance in this matter."*

Thereafter both arbitrators sent their final invoices to the solicitors representing their respective appointors.

(9)  On 13 May 2009, Mr King emailed Mr Meadows:-

*"I refer to my emails below.*

*I look forward to hearing from you without any further delay otherwise I shall have to discuss my Clients' options with them.  Today is the 14th day from acceptance, and thus the last day for payment under Part 36.11(6)."*

(10)  No reply having been received from RS, on 20 May 2009 WS faxed them reminding them that their clients offer of 8 April 2009 and WS's acceptance in their email of 29 April 2009 constituted the settlement agreement pursuant to which, since the offer was expressly stated to have the consequence of a Part 36 offer, payment should have been made within 14 days of the acceptance.  This not having occurred, there was clear breach of the settlement agreement, WS said.  In conclusion WS gave Owners until close of business London time on 22 May 2009 to pay US$1,275,000 with full interest, failing which Charterers would issue High Court proceedings in order to pursue their claim under the settlement agreement.

{11}  This fax having fallen on equally stony ground, on 27 May 2009 WS faxed RS asking them to confirm by return if they had authority to accept service of High Court proceedings.

{12}  This did evoke a response from RS faxed at 17:08 the same day, which was in the following terms:-

4

*"We refer to your faxes dated 20 May and 27 May, and to your clients' stated intention to commence proceedings under the settlement agreement. While our clients obviously cannot prevent this, please note however that they wish to explore the potential for resolution of all the outstanding matters in one go, with a view [to] achieving this under a single agreement.*

*In light of this, if your clients are willing to delay commencing proceedings for a short while it may avoid the need for any additional and unnecessary costs to be included in the meantime."*

(13) In reply, on 1 June 2009, WS commented that their clients already had a "single agreement" in respect of which Owners were in breach, but Charterers would give Owners until opening in London on 3 June 2009 to revert as to why they had not honoured the settlement. No reply was received by opening in London on 3 June, so that day WS again asked for confirmation from RS that they were authorised to accept service.

(14) On 8 June 2009 RS apologised for the delay in replying but said that they had instructions and would respond the next day. They did not, however, and on 26 June 2009 WS gave RS yet another deadline of *"5pm London time"* on 30 June 2009 to say whether Charterers accepted there was a settlement and if not, why not. In conclusion WS said that Charterers' right was reserved to consider Owners' *"apparent refusal to recognise the settlement agreement as a renunciatory breach of that agreement"* and they reserved the right to apply to the tribunal or the Court as necessary.

(15) No reply again having been received from RS, on 1 July 2009 WS sent a fax to the two arbitrators reciting the above history and requesting the tribunal:-

*"...to issue an Award confirming that Owners are to pay Charterers the sums identified in the Settlement Agreement."*

WS continued as regards jurisdiction:-

*"Charterers' position is that the Tribunal has jurisdiction to make such an Award for the following reasons:-*

(a) Pursuant to clause 17 of the charter, "should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred (as per Clause 73)".

A dispute arising out of the Settlement Agreement between the parties is clearly "any dispute...between Owners and the Charterers."

(b) Clause 73 provides for London Arbitration, English Law and the LMAA procedure.

This London Tribunal therefore has jurisdiction to determine this dispute;

(c) Owners' offer provided for the London Tribunal to assess both interest on the principal settlement sum, and costs, if these could not be agreed. This offer was accepted by Charterers.

(d) It was therefore an express term of the Settlement Agreement that the London Tribunal would have jurisdiction to determine matters under that contract."

(16) RS served submissions in answer on 15 July 2009. In these they challenged that the acceptance relied on by Charterers at 17:21 on 29 April 2009 was within the "close of business London time" on that day, this being rather 16:30. They also challenged the jurisdiction of the tribunal, arguing that:-

"The "dispute" to which clause 17 of the charter refers must arise out of or relate to the contract containing the arbitration agreement. No agreement to arbitrate a dispute under a separate settlement agreement could be inferred or implied from clause 17 of the Charterparty and such matters are therefore outside the jurisdiction of the Tribunal."

(17) Thereafter further submissions were exchanged raising points which were amplified by counsel for the parties at the hearing before the tribunal (by now with the addition of a third arbitrator rather than an Umpire – by agreement of the parties).

(18) Counsel for Charterers argued that the tribunal had jurisdiction for four reasons, namely:-

6

(i) The arbitration clause between the parties contained in the Charter was wide enough to encompass the present dispute in relation to the Settlement Agreement.

(ii) The Settlement incorporated by reference the arbitration clause between the parties contained in the original contract, this following from the fact that matters of assessment of interest and costs were reserved to the (already constituted) Tribunal, as part of (and notwithstanding) the settlement of the original issue between the parties.

(iii) The Settlement Agreement contained by necessary implication (to give effect to the common unexpressed intentions of the parties and or to give the Settlement Agreement business efficacy) an arbitration clause in identical terms to that contained in the original contract.

(iv) By virtue of paragraph 10 of the LMAA terms 2006 which provided:-

*"Notwithstanding the terms of any appointment of an arbitrator, unless the parties otherwise agree the jurisdiction of the tribunal shall <u>extend</u> to determining <u>all disputes arising under or in connection with the transaction the subject of the reference,</u> and each party shall have the right before the tribunal makes it award for determination of any <u>further dispute(s) arising subsequently to the commencement of the arbitral proceedings</u>."* (Emphasis provided by Charterers' counsel.)

(19) As regards (i), Charterers' counsel said that the following clauses in the charter were material:-

*"17.  That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred (as per clause 73)"*

*"73. <u>Arbitration</u>*
*Any dispute arising under the Charter to be referred to arbitration in London, one arbitrator to be nominated by the Owners and the other by the Charterers and in case the arbitrators shall not agree then to the decision of an Umpire to be appointed by them, the award of the arbitrators or the Umpire to be final and binding upon both parties.*

*...*

*This contract is governed by English Law and there shall apply to all proceedings under this Clause the terms of the London Maritime Arbitrators*

7

*Association current at the time when the arbitration proceedings were commenced."*

*"86. Negotiations and fixture to be in accordance with English Law, Arbitration in London and English Law to apply and to be kept strictly private and confidential."*

(20)  Charterers' counsel submitted that clause 17 was drafted in extremely wide terms, not even referring expressly to the charter, although he accepted that there must be some factual connection between a dispute and the charter for the arbitration clause to apply.  A dispute in relation to whether a claim for breach of the charter had been settled fitted within such wide wording, he said, being on any view, both as a matter of logic and language, plainly a *"dispute arising under the Charter"*.  Without the charter, he submitted, there would be no claim for any Settlement Agreement to be referable to.

(21)  Counsel for the Owners submitted that clause 17 had to be read in conjunction with clause 73, and the latter, being a typewritten clause, was to be preferred in any case of conflict between the two.  This was not, however, necessary he argued because clause 17 referred the reader to clause 73 in order to ascertain what was arbitrable and how it was to be arbitrated.  Clause 73 was quite clear that any dispute had to be one – *"arising under the Charter"* – to be arbitrable and as the Settlement Agreement had, as a separate contract, replaced the charter, by no manipulation of wording could a dispute as to whether there had been a concluded settlement be considered as *"arising under the Charter"*.  Rather it arose under the Settlement Agreement, and it was for the alleged breach of this agreement, not the Charter, that the Charterers had asked the tribunal for relief in their claim submissions.

(22)  We disagree.  To begin with we consider that as a matter of construction of clause 17 and 73 there is no conflict.  Clause 17 is couched in the widest terms – *"should any dispute arise between Owners and Charterers"*, and then understandably because of the deletion of the provisions regarding the constitution of the tribunal (to which deletion we consider we can have regard in

8

the present context) it refers us to clause 73 in order to ascertain how the *"dispute"* referred to in clause 17 is to be arbitrated i.e. in London, etc.

(23)  If it is objected, as Owners do, that this involves gainsaying *"under the Charter"*, as Charterers' counsel stressed and is now well understood in arbitration circles:-

> *"...any jurisdiction or arbitration clause in an international contract should be liberally construed"* (per Longmore LJ in **Fiona Trust v Privalov** [2007] 2 Lloyd's Rep 267 at 272 §18.

In particular, as Longmore LJ continued in that paragraph:-

> *"Although in the past the words "arising under the contract" have sometimes been given a narrower meaning, that should no longer continue to be so.  Since both phrases are used in the present case there is, in any event, no need here to differentiate between them but the proposition that the phrases "under" and "out of" should be widely construed is to my mind strongly supported by Mackender v Feldia.  Mr Butcher submitted that times have moved on since that decision and that more recent decisions (particularly Ashville v Elmer and Fillite v Aqua-Lift) have emphasised the difference between the phrases "under" "out of" and "in connection with".  We do not read Ashville in that way; Fillite can be so read but neither Mackender nor the Playa Larga were cited and that must detract from its weight as an authority.  Even Mr Butcher did not submit that Fillite was an authority which bound us in relation to the particular clause before us.*
>
> *One of the reasons given in the cases for a liberal construction of an arbitration clause is the presumption in favour of one-stop arbitration..."*

(24)  This approach by the Court of Appeal was endorsed by the House of Lords when dismissing the Owners' appeal.  In particular, we were referred to, and respectfully adopt, the approach of Lord Hoffman in the House of Lords [2008] 1 Lloyd's Rep 254 at 256 §§5-7, especially in §7 where he said:-

> *"...there is no rational basis upon which businessmen would be likely to wish to have questions of the validity or enforceability of the contract decided by one tribunal and questions about its performance decided by another, one would need to find very clear language before deciding that they must have had such an intention,"*

9

and Lord Hope at §29 of his speech:-

> *"The Court of Appeal said that the time had come for a fresh start to be made, at any rate for cases arising in an international commercial context."*

(25) As a result of the decision in **Fiona Trust** we consider we can read the arbitration provisions as referring to disputes not only arising under the charterparty but also in connection with it. This is because of the presumed intention of the parties as referred to in that case, where the House of Lords adopted the purposive approach in assuming that the parties intended a "one-stop" dispute resolution arrangement. If that is right, then it seems to us that a dispute as to whether claims arising under the charterparty have been settled or not are disputes arising in connection with the charterparty. Relying on the purposive approach, it is difficult to imagine that the parties intended to agree that their dispute should be referred to arbitration but if at any point there was a question as to whether all or any part of those disputes had been settled during the course of the arbitration, the parties would have to sort that out in the Courts rather than before the same tribunal - with the inevitable delay and increased costs.

(26) Charterers' counsel also relied strongly on **Halki Shipping Corporation v Sopex Oils Ltd** [1998] 1 Lloyd's Rep 465, particularly on passages in the judgements of Henry and Swinton-Thomas LJJ, in particular that of the latter at p 477 (col 2) where he said, as regards bifurcating claims between the courts and arbitration:-

> *"Furthermore, as an additional absurdity, if an entire claim was submitted to arbitration, the arbitrator would have no power to make an award on those parts of the claim in respect of which there was no arguable defence or no real or genuine dispute, but to make an award in respect of which there was a genuine dispute but in respect of which the defendant's argument failed. This argument seems to me to be compelling, and Mr Hamblen had no real answer to it save to say it would be unlikely to arise in practice. I have serious doubts about that proposition when applied to a defendant who is anxious to delay payment for as long as possible."*

10

(27) The same logic, Charterers' counsel argued, must apply in relation to a partial settlement. Where was the logic, he asked, in the tribunal continuing to deal with disputes not settled but the parties having to go to Court for confirmation that a claim previously before the arbitrator had in fact been settled?

(28) Owners' counsel contended that the present case was entirely different from **Halki** as Owners had not admitted liability in the present case, nor that any sum was due under the charter. This may be so, but we consider that underlying approach adopted by the court in **Halki** of avoiding a multiplicity of jurisdictions is equally applicable to the present case.

(29) Similar reasoning seems to us to apply to the decision in **Exfin Shiping Ltd v Tolani Shipping Co Ltd** [2006] 2 Lloyd's Rep 389, where Langley J also deprecated any approach which required a claimant to choose between alternative court or arbitral jurisdictions or pursue the only safe route of following both.

(30) Counsel for the Owners also relied on the judgement of Rix J, as he then was, in **The "Paolo D'Alesio"** [1994] 2 Lloyd's Rep 366. There the court had to consider whether a plea that an agreement that purported to settle disputes arising under a bill of lading was voidable for duress came within the scope of the arbitration clause incorporated into the contract of carriage which conferred jurisdiction on the tribunal in respect of disputes arising under the bill of lading. It was held that the plea as to the validity of the settlement agreement was outside the tribunal's jurisdiction.

(31) Charterers' counsel, however, pointed out that the disputed settlement agreement there had an express term in clause 5 which ceased the arbitral proceedings, as was accepted by Rix J when he said (p370, col 1):-

> *"In my judgement cl.5 of the settlement agreement is a complete bar to Mr. Robertson's jurisdiction in the arbitration commenced by the defendants on Dec 18, 1992. Clause 5 says that:-*

11

*By signing this Agreement the parties settle their differences, cease the arbitrary case in London..."*

(32) We agree with Charterers' counsel and do not find that **The "Paolo D'Alesio"** requires us to reach a different conclusion to the one we do as regards finding that we have jurisdiction in the present case.

(33) Owners' counsel also drew our attention to the apparently differing conclusions reached by text book writers on this problem, pointing out that while Foskett in **"Law and Practice of Compromise"** (5th edition 2005) §41-11 supported Charterers' submission, both Bernstein's **"Handbook of Arbitration and Dispute Resolution"** (4th edition 2003) §52-750 and Merkin **"Arbitration Law"** (Service Issue No 39, 10 December 2004) §18.15 were of the view that:- *"If an agreed award is not made it will be necessary for a party wishing to enforce the settlement agreement to bring an action on it..."* (per Merkin).

(34) Counsel for the Charterers submitted that the preceding paragraph in Foskett, §41-10 (which Owners' said was without any authority cited in support) was to the contrary effect to that advanced by the Owners in the present case namely:-

> *"It is therefore suggested that in the first instance the arbitral tribunal is the appropriate forum before which to bring the issue of the validity of any compromise."*

This he said was an approach more in line with the 1996 Arbitration Act and **Fiona Trust**. As to Merkin, he said the statement in the text was simply wrong and similarly did not fit with the philosophy of the 1996 Act. We do not find ourselves assisted by these somewhat divergent text book views.

(35) Nor are we persuaded by Owners' counsel's submission that we should regard the Settlement Agreement as a separate contract which replaced the charter so that the present dispute as to whether there had been a settlement arose under the Settlement Agreement and not the Charter. To begin with the Settlement Agreement clearly and expressly envisages that the tribunal still has jurisdiction

12

by its reference to *"both interest and costs to be assessed by the Tribunal if not agreed between the parties"*. This we consider is a strong indication that the intention of the parties when seeking to settle their dispute was to continue to regard the 'umbrella' of the charter arbitration clause as still operating as regards disputes between them. We can see no justification for any separation of jurisdiction between court and arbitration as regards different disputes that might thereafter arise.

(36) Accordingly we find that the original arbitration clause in the charter subsists and is applicable to the tribunal's jurisdiction over the dispute whether there was a settlement of the original dispute brought under the charter. That suffices to determine our jurisdiction, but as this question may go further, as is permitted by the Act, we deal relatively briefly with the other submissions on our jurisdiction addressed to us.

(37) As regard (ii), we have in effect already dealt with this in paragraph 35 above. Counsel for the Owners argued that the express specific reservation of our jurisdiction as regards interest and costs should be regarded as hiving off these two aspects only, so that for all other purposes or disputes we no longer were intended to have jurisdiction. We do not agree. We consider that in so expressing themselves in their offer the Owners were simply acknowledging that interest and costs had not been dealt with, unlike the principal sum, and were just confirming that if these became in dispute they would be dealt with under the charter arbitration clause which still existed. No doubt it did not cross the mind of the draftsman of the offer that there would be any dispute regarding payment of the principal sum, but by catering for the charter arbitration clause to apply to a possible dispute in other regards, we consider the charter arbitration clause was in effect incorporated in the Settlement Agreement.

(38) As regards (iii) – an identical arbitration clause to that in the charter applies through implication – counsel for the Charterers said this followed from the express jurisdiction reservation as regards costs and interest in the Settlement Agreement and such an implication gave effect to the common unexpressed intentions of the parties. Alternatively, such an implication was necessary to

13

give business efficacy to the Settlement Agreement in that parties operating, as here, in an international sphere chose arbitration as their dispute resolution mechanisms for reasons both of enforcement and the 'one-stop' facility which it provided.

(39) Owners' counsel retorted that to imply the charter arbitration clause into the Settlement Agreement would be inconsistent with the charter because in the Settlement Agreement expressly only disputes regarding costs and interest were left to the tribunal's jurisdiction. It was not necessary to give business efficacy to the Settlement Agreement to make the implications in question, the Agreement working perfectly well without it. Nor, he said, was there any likelihood that if the 'officious bystander' had enquired whether a dispute as to whether a settlement agreement had been concluded would be determined by the mechanism of the charter arbitration clause, he would have been testily suppressed by the parties saying – *"of course"*. We only had to look at WS's uncertainty whether to go to court or arbitration to resolve this issue, he said, to find the answer to the officious bystander test.

(40) This issue was not extensively argued before us at the hearing but we consider we should of course deal with the matter, albeit briefly. In the view of the majority of the Tribunal an arbitration clause is not to be implied. If, contrary to what we have found, the existing arbitration clause is not wide enough to include the dispute as to whether there was a settlement of the original dispute brought under the charter, then as a matter of construction it would not appear possible to imply an arbitration clause identical to that to be found in the charter because that would be inconsistent with the terms of the Settlement Agreement. The Settlement Agreement maintained the Tribunal's jurisdiction in relation to two aspects of the matter, namely interest and costs relating to the original dispute, whereas all other aspects of the matter were purportedly settled and, consequently, not left to the Tribunal.

(41) Furthermore, the majority of the Tribunal does not consider that the term is to be implied in order to give the Settlement Agreement business efficacy. Although it is of course convenient to have a jurisdiction clause in a settlement

14

agreement, many such agreements are made without such a clause, either intentionally or inadvertently, and they can work perfectly well without such a provision. Furthermore, as to whether such a provision should be imported into the Settlement Agreement as a matter of obvious implication, quite apart from the point of construction referred to above, and again, however convenient it might be to have such a provision, we are far from convinced that an officious bystander would regard such an arbitration provision as being obviously implied. Indeed, as Counsel for the Respondents pointed out, the Claimants themselves appeared to be uncertain of the matter when the dispute first arose in that they plainly intended to refer the matter to the High Court having stated to the Respondents' solicitors *"My Clients will issue proceedings against your Clients in the High Court in London in order to pursue their claim under the settlement agreement"* and subsequently asking them to confirm by return *"that you have authority to accept service of High Court proceedings on behalf of your Clients"*.

(42) A minority of the tribunal (Mr J.C. Sheppard) dissented on this issue. He considers that there was a clear indication from the Privy Council in **Attorney-General of Belize v Belize Telecom** [2009] UK PC 10 that the question whether a term should be implied into a contract resulted from what the express terms read in their relevant context would reasonably be understood to mean, and he noted that Lord Hoffmann in **Belize** referred with approval to the point made by Lord Steyn in **Equitable Life Assurance Society v Hyman** [2002] 1 AC 408 that in that case an implication was necessary – *"to give effect to the reasonable expectations of the parties"*. He fully accepts that in **Mediterranean Salvage & Towage Ltd v Seamar Trading and Commerce Inc** [2009] EWCA Civ 531 Lord Clarke, as Master of the Rolls, said that he considered Lord Hoffmann was *"not in anyway resiling from the often stated proposition that it must be necessary to impose the proposed term. It is never sufficient that it should be reasonable"*, but he considers that in the present case adopting either approach produces the same result – that the term Owners sought should be implied.

(43) The dissenting arbitrator considers that the parties' reasonable expectations must be viewed objectively, but doing so leads, he finds, to the inescapable conclusion that the parties intended that any dispute, including here whether the offer was accepted in time, should be adjudicated by the same tribunal that was expressly referred to in relation to interest or costs. Equally, the implied term was, in his view, necessary to give business efficacy to the settlement proposal. It would not be an efficacious business approach for the parties to be uncertain as to which jurisdiction governed different aspects of the settlement. The stress should be as much on "*business efficacy*" as on "*necessary*". The uncertainty exhibited by W.S. as to jurisdiction did not, he considers, undermine the application of this test. Accordingly, he would also accept Charterers' counsel's reason (iii).

(44) Finally as to (iv) – specific jurisdiction is provided by paragraph 10 of the *LMAA Terms 2006* – Counsel for the Charterers submitted that the parties had not otherwise agreed and the dispute about the Settlement Agreement plainly arose "*under*" or "*in connection with*" the "*transaction the subject of the reference*", i.e. the underlying charter between the parties. There had been no award yet, and accordingly the Charterers had the right to refer to the tribunal "*any further disputes*" subsequently arising, which included a dispute about the Settlement Agreement.

(45) Owners' counsel stressed that the dispute which it was sought to add via paragraph 10 had to arise – "*in connection with the transaction the subject of the reference*", and that term was not broad enough to extend to matters arising out of separate contracts or "*transactions*" albeit that they were between the same parties and might bear some connection to the original transaction. Paragraph 10, he said, was not intended to extent the ambit of the arbitration agreement in one contract (the charter) to enable a dispute to be referred under it which arose out of a new and separate contract (the Settlement Agreement).

(46) We consider that paragraph 10 does operate to vest us with jurisdiction because of the "*in connection with*" provision even if, contrary to the view expressed above, the arbitration clauses in the charter are not to be read as having that

16

breadth. We do not think there is much in the argument to say that the primary basis for our jurisdiction consists of the arbitration clauses and the LMAA Terms cannot be read to go beyond the jurisdiction set out in those clauses. This is because the LMAA Terms are specifically referred to in clause 77 and the parties have agreed that any arbitration should be on those Terms. Consequently, the parties can be taken to have agreed the contents of the Terms at the time of entering into the charter.

(47) We therefore find that for these reasons we do have jurisdiction to determine whether or not there was a concluded Settlement Agreement, to which issue we now turn.

## Did Charterers accept Owners' offer in time?

(48) Owners' counsel argued, first, that the crucial term of their offer that it would –
"...*lapse at close of business London time that day...*" (29 April 2009) had to be, in accordance with the canons of construction, construed in accordance with its own terms but against the background of the whole of the contract in which it is to be found and the factual matrix pertaining at the time the contract was concluded. The term "*close of business London*", he submitted, had a precise, widely and well-known meaning, namely 16:30. It was derived from the City of London's mercantile exchanges which traditionally closed at 16:30. He gave as examples, the Baltic Exchange which, when it had a trading floor, was open for business until 16:30. The same applied, he said, as regards the closure time of the London Stock Exchange Main Market. Also London's banks and the courts in England and Wales officially closed for business each day at this time each week-day. Finally it was generally regarded as the time to which the arbitral day ran in the ordinary course of things.

(49) We do not agree. Certainly in the modern 21st century age of instant worldwide electronic communication, the concept of "*close of business*" has something of an anachronism about it, particularly as in the maritime sphere business goes on "24/7", to use modern terminology. However, clearly the parties, and

17

particularly Owners intended something less than this when using the term. As Owners' counsel submitted, the background of the contact which the term is found must be borne in mind when construing it. In our view this is clearly the *"close of business"* as far as London commercial solicitors are concerned, since it was between two such firms that the agreement was concluded.

(50) Generally, we do not accept for a minute from our considerable experience of dealing with such firms, particularly in interlocutory arbitral matters, that c.o.b. London time is 16:30. This simply sounds to folly. Communications, even those sent by humans rather than from pre-programmed machines, continue long after this time, and we are sure both firms in the present reference would not expect arbitrators to cease to deal with interlocutory matters after 16:30. We would be extremely surprised if in any firms of commercial solicitors staff left before at least 17:30. The scenes on the London Underground and mainline termini from this time bear this out. We consider analogies with other organisations' c.o.b. to be irrelevant and of no help.

(51) Owners' counsel said that Charterers were unable to say clearly when c.o.b. London time was, and it was fatal to Charterers' case that they could not clearly do so, but depended on subjective variables to arrive at some time after 17:30 in order to get their 17:24 acceptance within time before the offer lapsed at c.o.b that day. Charterers' counsel replied, and we accept his submission, that for the purpose of the present case, he would accept that 17:30 was c.o.b. London time. This is what applying an objective test would produce, in our view.

(52) In so far as the correspondence between the parties' solicitors can justifiably be regarded as contributing to their understanding of the term in question, we note Mr Meadows of Owners' solicitors on 29 April 2009 himself responded to Mr King of Charterers' solicitors (see paragraph 6 above) at 17:01, and later, on 27 May 2009 Mr Meadow's email (see paragraph 12 above) was sent at 17:08. Both of these times support the view that, as Charterers' counsel put it to us – *"As a matter of common sense and business practice, a suggestion that Reed Smith and Winter Scott close for business at 4:30pm would be met by their clients with*

18

*alarm and incredulity in equal measures*. These emails reinforce our view that 17:30 was the c.o.b. time intended by the parties for the purpose of acceptance of the settlement offer made by Respondents.

(53) Such authorities as we were referred to were, as both counsel accepted, of peripheral value and we do not find them of assistance in reaching our decision on the validity of Charterers' acceptance in the present case.

(54) Questions of whether the doctrines of waiver or estoppels were relevant and could be advanced by Claimants in support of their claim, were debated before us by counsel but again we do not feel we need enter into these areas in order to reach our firm conclusion which is that we construe *close of business London time* on 29 April 2009, at which time the offer would lapse, as being 17:30. Accordingly, as Charterers' solicitors sent their acceptance at 17:21 on that day, this was a valid acceptance of the offer and a binding settlement agreement was concluded.

(55) Finally, Charterers' counsel also relied upon s.40(1) of the Arbitration Act 1996, and paragraph 16 of the LMAA Terms, arguing that it was a logical collorary that it must be the duty of a party which denies that a settlement has been reached immediately to make it clear to its counterpart and to the Tribunal that no settlement had in fact been reached if those other are proceeding on the basis that it has. Notwithstanding the various communications, counsel said, at no time until service of Defence Submissions of 15 July 2009 did the Respondents seek to contend that the Settlement Agreement had not, after all, been reached. Owners' counsel said this was simply a misreading of these sections and begged the question whether a settlement had been reached. We agree.

## Form of our Award

(56) At the conclusion of the hearing there was (inevitably) a somewhat inconclusive debate before us as to the form our award (or awards) should take and the

19

parties agreed to leave this to us. In view of the conclusions we have reached our Award is embodied in one document pursuant to s31(4)(b) of the Arbitration Act 1996 in which we deal first with our jurisdiction which is challengeable in any event under s.67 of the Arbitration Act 1996; and on the basis that we find we have jurisdiction, we also deal with the merits of the substantive issue → whether there was a concluded settlement.

## Costs

(57) Charterers, having succeeded on both the jurisdiction and substantive issues covered by this Award are awarded their recoverable legal costs up to the conclusion of the settlement agreement on 29 April 2009.

(58) We were however asked to reserve the costs of this Award, which we do.

IN MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN ARBITRATION

BETWEEN:

THE RICE COMPANY USA

CLAIMANTS
(CHARTERERS)

AND

EXPRESS SEA TRANSPORT CORP

RESPONDENTS
(OWNERS)

m.v. "APOSTOLOS II"

(CHARTERPARTY DATED 4th APRIL 2007)

---

**AWARD AS TO JURISDICTION AND ON THE MERITS PURSUANT TO
s.31(4)(b) OF THE ARBITRATION ACT 1996**

---

WHEREAS:

A. By a charterparty on the NYPE form (1946) dated 4 April 2007 ("the charter") Express Sea Transport Corp, Owners of the "Apostolos II" ("Respondents") chartered the "Apostolos II" to The Rice Company USA ("Claimants") for *"a Time Charter Period about 11 months to about 13 months in Charterers' option..."*, upon the terms and conditions more fully set out in the charter.

B. By clause 17 of the charter it was provided:-

> *"That should any dispute arise between Owners and the Charterers the matter in dispute shall be referred (as per Clause 73)."*

By clause 73 it was provided, *inter alia*:-

> *"73. Arbitration*
> *Any dispute arising under the Charter to be referred to arbitration in London, one arbitrator to be nominated by the Owners and the other by the Charterers and in case the arbitrators shall not agree then to the decision of an Umpire to be appointed by them, the award of the arbitrators or the Umpire to be final and binding upon both parties.*
>
> *...*
>
> *This contract is governed by English Law and there shall apply to all proceedings under this Clause the terms of the London Maritime Arbitrators Association current at the time when the arbitration proceedings were commenced."*

C. Disputes did arise between the parties for the determination of which Claimants appointed the undersigned Robert Gaisford of Bramdean, Stonegate, Wadhurst, East Sussex TN5 7EP to be the arbitrator appointed by them, and Respondents appointed the undersigned Alexander J. Kazantzis of 14 Kildare Terrace, London W2 5LX to be the arbitrator appointed by them. We the two arbitrators so appointed then appointed John Colin Sheppard of 43 Park Road, London W4 3EY to be the third

arbitrator (agreement being reached with the parties that Mr Sheppard should fulfil this role rather than that of an Umpire).

**D.** During the course of the reference a question arose as to the jurisdiction of the tribunal to determine an issue as to whether there had been a valid settlement ("the Settlement Agreement") of the reference by Claimants having accepted an offer by Respondents, the latter asserting that the offer had lapsed before it was accepted by Claimants. Upon Claimants seeking an Award from the tribunal that they were entitled to the sums identified in the Settlement Agreement. Respondents' further challenged the jurisdiction of the tribunal to determine the dispute regarding whether or not there had been a settlement of the reference.

**E.** For the resolution of these issues which had arisen in the course of the reference it was agreed that the tribunal should determine:-
    (a)    Whether the tribunal has jurisdiction to make an Award in respect of the alleged Settlement Agreement?
    (b)    Was Respondents' offer validly accepted by being accepted by Claimants before "close of business London time" on 29 April 2009?
    (c)    Which party is liable for costs both up to and following the alleged settlement agreement?

**F.** The parties through their respective London solicitors made written submissions in respect of these issues and on 14 July 2010 a hearing was held at the offices of Reed Smith at Broadgate Tower, 20 Primrose Street, London, EC2A 2RS at which the tribunal was addressed by counsel instructed on behalf of Claimants and one of Her Majesty's Counsel instructed on behalf of the Respondents.

**G.** The seat of this arbitration is London, England.

NOW WE, Robert Gaisford, Alexander J. Kazantzis, and John Colin Sheppard, having taken upon ourselves the burden of this reference and carefully and conscientiously considered the submissions addressed to us by counsel, read and examined the documents placed before us, weighed the evidence giving due weight thereto, finding ourselves in agreement, and having reached a decision, DO NOW HEREBY MAKE, ISSUE AND PUBLISH this, our AWARD AS TO JURISDICTION AND ON THE MERITS as follows:-

(1) WE FIND AND DECLARE that we have jurisdiction to make an Award in respect of the alleged Settlement Agreement.

(2) WE FURTHER FIND AND DECLARE that the Respondents' offer of settlement was validly accepted by the Claimants before "*close of business London time*" on 29 April 2009.

(3) WE RECORD that, it having been established by this Award that the settlement agreement was validly accepted by the Claimants, in accordance with the parties' agreement, it is agreed that the Respondents shall bear their own and the Claimants' recoverable legal costs incurred up to the conclusion of the settlement agreement on 29 April 2009 together with interest on the said costs at the rate of 4.50% per annum or pro rata compounded with three monthly rests, such costs if not agreed, to be assessed under s63(3) of the Arbitration Act 1996 on the standard basis as set out in s63(5) of the Act either (in Claimants' option) by the High Court or by ourselves in an Award on Assessment of costs for which purpose we expressly reserve jurisdiction.

(4) We were requested to RESERVE COSTS in respect of this Award which WE HEREBY do, including the cost of this Award of £19,690.00.

(5) WE FURTHER DECLARE that this Award is FINAL as to the matters hereby determined.

Given under our hands in London this 23rd day of September 2010.

_Robert Gaisford_
Robert Gaisford

_Witness_
Witness

_Alexander J. Kazantzis_
Alexander J. Kazantzis

_Witness_
Witness

_John Colin Sheppard_
John Colin Sheppard

_Witness_
Witness

Exhibit B

## Claim Form
### (arbitration)

**In the**
High Court of Justice, Queen's Bench Division,
Commercial Court

| | for court use only |
|---|---|
| Claim No. | 2011-1116 |
| Issue date | 21-9-11 |

NOT FOR SERVICE OUT
OF THE JURISDICTION

**In an arbitration claim between**

### Claimant
The Rice Company USA
11140 Fair Oaks Blvd
Ste 101
Fair Oaks
CA 95628
USA



HIGH COURT OF JUSTICE
SEAL
21 SEP 2011
ADMIRALTY AND COMMERCIAL COURT

### Defendant(s)
Express Sea Transport Corp.
c/o Patton, Moreno & Asvat
Capital Plaza Building
8 Floor
Roberto Motta Boulevard, Costa del Este
Panama City
Republic of Panama

**In the matter of an [intended] arbitration between**

### Claimant
The Rice Company USA
11140 Fair Oaks Blvd
Ste 101
Fair Oaks
CA 95628
USA

### Respondent(s)
*Set out the names and addresses of persons to be served with the claim form stating their role in the arbitration and whether they are defendants.*

Express Sea Transport Corp.
c/o Patton, Moreno & Asvat
Capital Plaza Building
8 Floor
Roberto Motta Boulevard, Costa del Este
Panama City
Republic of Panama

| Defendant's name and address | Express Sea Transport Corp.<br>c/o Patton, Moreno & Asvat<br>Capital Plaza Building<br>8 Floor<br>Roberto Motta Boulevard, Costa del Este<br>Panama City<br>Republic of Panama | ☐ This claim will be heard on:<br><br>at    am/pm<br><br>☐ This claim is made without notice. |
|---|---|---|

The court office at

When corresponding with the court, please address forms or letters to the Court Manager and quote the case number.

N8 Claim form (arbitration)

| Claim No. | |
|-----------|--|

## Remedy claimed and grounds on which claim is made

Claimants seek permission to enforce the Final Arbitration Award dated 23 September 2010 as if it were a judgment to the same effect.

Pursuant to the Final Arbitration Award dated 23 September 2010, the Tribunal confirmed the validity of a settlement agreement between Claimants and Defendants concluded on 29 April 2009 under which Defendants were to pay Claimants the sum of US $1,275,000 plus interest and costs. However, to date, Defendants have not paid under the Award.

| | Claim No. | |
|---|---|---|

The claimant seeks an order for costs against
Defendants.

Statement of Truth
*(I believe)(The Claimant believes) that the facts stated in these particulars of claim are true.
* I am duly authorised by the claimant to sign this statement

Full name _____ James Charles King _____

Name of claimant's solicitor's firm _____ Winter Scott LLP _____

signed_____     position or office held _____ Partner _____

*(Claimant)(Claimant's solicitor)          (if signing on behalf of firm or company)

*delete as appropriate

Winter Scott LLP
St Olave's House
Ironmonger Lane
London
EC2V 8EY

Claimant's or claimant's solicitor's address to
which documents should be sent if different from
overleaf. If you are prepared to accept service by
DX, fax or e-mail, please add details.

Ref: JCK/km/78/49
Fax: 020 7726 2371
Email: jking@winterscott.co.uk

(1) Claimants
(2) J. C. King
(3) 1st
(4) "JCK 1"
(5) 21st September 2011

**IN THE HIGH COURT OF JUSTICE**                                    2011 Folio
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

.B E T W E E N:

THE RICE COMPANY USA                                    <u>Claimants</u>

- and-

EXPRESS SEA TRANSPORT CORP                              <u>Defendants</u>

M/V "APOSTOLOS II"

_____

·   WITNESS STATEMENT OF JAMES CHARLES KING

_____

I, James Charles King, of St Olave's House, Ironmonger Lane, London EC2V 8EY say
as follows:

Introduction

1.      I am a partner in the firm of Winter Scott LLP and a Solicitor of the Senior
        Courts. I am instructed on behalf of the Claimants and I am duly authorised by
        them to make this statement in support of their application to enforce the
        arbitration award dated 23 September 2010 ("the Award") in the same manner
        as a judgment or order of the Court to the same effect, pursuant to section 66
        of the Arbitration Act 1996 ("the Act").

2.      I attach as "JCK1" a paginated bundle of copy documents to which I will refer.
        Unless otherwise stated, page numbers refer to the pages of this exhibit.

3.    The Claimants seek an order from the Court in the terms of the draft attached to the Claim Form.

**Background**

4.    The Claimants chartered the M/V "APOSTOLOS II" from the Defendants by way of charterparty based on the NYPE 1946 Form dated 4 April 2007 ("the Charterparty"). A copy of the Charterparty is attached as pages 1 to 33.

5.    A dispute arose between the parties, with the Claimants asserting that the Defendants had wrongfully withdrawn the vessel from their service.

6.    Disputes under the Charterparty were to be determined in London Arbitration, and the Claimants appointed Mr Robert Gaisford as their Arbitrator and the Defendants, represented by Messrs Reed Smith Richards Butler, appointed Mr Alec Kazantzis as their Arbitrator.

**The Original Arbitration Reference**

7.    The Claimants served Submissions of Claim on 20 December 2007, claiming the total principal sum of US$4,806,170.13 under their Final Hire Statement, and as damages for the wrongful withdrawal of the vessel.

8.    This arbitration reference proceeded fairly uneventfully, with the parties serving further pleadings. However, behind the scenes the parties were also discussing a possible amicable settlement of the matter, and on 8 April 2009 Reed Smith on behalf of the Defendants sent to this firm a settlement offer, expressed to have the consequences of a Part 36 offer, to pay the Claimants the sum of US$1,275,000 plus interest and costs. The offer stated that it was open until *"close of business London time"* on 29 April 2009 (unless sooner withdrawn).

9.    This offer was accepted by ourselves on behalf of the Claimants at 17:21 hours on 29 April 2009. It was the Claimants' position that the offer of 8 April 2009 and the acceptance of 29 April 2009 together constituted a binding settlement agreement between the parties.

10.   Despite several chasers from this firm, the settlement sums were not paid, and on 1 July 2009 we served Submissions of Claim on behalf of the Claimants, before the original arbitration Tribunal, seeking the sums stated in the settlement agreement.

The Second Arbitration Reference and the Award

11.   In response to these Submissions of Claim, Reed Smith on behalf of the Defendants argued that the Tribunal had no jurisdiction to hear the claim under the settlement agreement, and that in any event, *"close of business London time"* meant 16:30 hours, so that the *"acceptance"* at 17:21 hours was too late to constitute a binding agreement.

12.   However, following an exchange of written submissions and a one-day oral hearing before the Tribunal, by an Award dated 23 September 2010 [pages 34 to 59], the Tribunal held that they did have jurisdiction to make an Award in respect of the settlement agreement, and further held that the offer had been validly accepted before *"close of business London time"*.

13.   The Tribunal further held that, given that there was a binding settlement agreement, the Claimants were entitled to their costs of the original arbitration reference, with interest thereon, and reserved to itself jurisdiction to determine those costs, together with liability for the cost of the second arbitration reference (the parties having asked it to do so).

14.   I would however ask the Court to note that the Claimants are not seeking, at the present time, to enforce their entitlement to interest and costs due on the principal settlement sum of US$1,275,000, since these have not yet been agreed by the Defendants, nor determined by the Tribunal. However, the Claimants reserve the right to claim interest and costs under the settlement agreement, together with the costs associated with the second arbitration award (liability for which has yet to be determined), at a later stage.

**The Need for Judicial Enforcement of the Award**

15. To date, the Defendants have not paid the Claimants the settlement sums, the entirety of which remains due and owing pursuant to the Award.

16. The Defendants have therefore entirely failed to comply with the Award.

17. As such, the Claimants now seek permission to enforce the Award in the same manner as a judgment or order of the Court to the same effect.

**Service**

18. I understand from CPR Part 62.18 that this application is made on a without notice basis, but that, if the Court does not immediately grant the application, it may decide to order that the arbitration claim form and associated documents be served on the Defendants. In the event that the Court does so decide, I respectfully request the Court to grant permission to serve the arbitration claim form and associated documents on Reed Smith, as they previously represented the Defendants, and have not advised me that they are no longer instructed.

**Conclusion**

19. I respectfully request that the Court makes an order in the terms set out in the attached draft.

---

Statement of Truth

I believe that the facts stated in this witness statement are true.

Signed.............................................................

Dated.............................21/9/11.....................

<u>Address for service of documents</u>

Winter Scott LLP
St Olave's House
Ironmonger Lane
London
EC2V 8EY

Exhibit C

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT

2011 Folio 

Before the Honourable Mr Justice Burton

B E T W E E N:

THE RICE COMPANY USA

_Claimants_

- and -

EXPRESS SEA TRANSPORT CORPORATION

_Defendants_

M/V "APOSTOLOS II"

---

ORDER SEEKING PERMISSION TO ENFORCE AN ARBITRATION AWARD
IN THE SAME MANNER AS A JUDGMENT TO THE SAME EFFECT

---

UPON READING the Witness Statement of James Charles King dated 21st September 2011.

IT IS ORDERED that:

1. Permission be granted to Claimants to enforce the Final Arbitration Award dated 23 September 2010 made between Claimants and Defendants, in the same manner as a Judgment or order to the same effect.

2. Defendants do pay the costs of this application, to be assessed if not agreed.

3. The Claimants have permission to serve the Arbitration Claim Form and this Order on the Defendants on their solicitors, Reed Smith, at Broadgate Tower, 20 Primrose Street, London EC2A 2RS.

4. Defendants may apply to set aside this Order within 14 days after service.

5. This Order may not be enforced until after the end of that period or any application by the Defendants to set it aside has been finally disposed of.

Dated   23rd September 2011

Exhibit D

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/8/14
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————

THE RICE CORPORATION, a Delaware        :
corporation d/b/a THE RICE COMPANY USA, :   Index No.:  13 Civ. 43 (WHP)
                                        :
                    Plaintiff,          :
                                        :   **JUDGMENT**
        vs.                             :
                                        :
EXPRESS SEA TRANSPORT CORPORATION,      :
                                        :
                    Defendant.          :

—————————————————————————

       **WHEREAS** Plaintiff, The Rice Corporation, a Delaware corporation d/b/a The Rice Company USA ("Plaintiff"), commenced this action on January 2, 2013 by filing a Summons and Verified Petition against defendant Express Sea Transport Corporation ("Defendant") seeking recognition of a foreign judgment of the High Court of Justice, London England, pursuant to Article 53 of the New York Civil Practice Law and Rules; and

       **WHEREAS** the English High Court of Justice, Queens Bench Division, Commercial Court issued a Judgment Order on September 23, 2011, granting Plaintiff judgment in the amount of $1,275,000.00 plus costs to be ascertained by the English High Court; and

       **WHEREAS** Plaintiff moved this Court for an order pursuant to Article 53 of the New York Civil Practice Law and Rules recognizing and enforcing the September 23, 2011 Judgment of the English High Court; and

       **WHEREAS**, by Order dated _1/8/14_____, this Court granted Plaintiff's motion on default to recognize and enforce the September 23, 2011 Judgment of the English High Court.

1

**NOW, THEREFORE, IT IS HEREBY**

**ORDERED, ADJUDGED, AND DECREED** that Judgment be entered against Defendant and in favor of Plaintiff in the amount of $1,275,000.00 (One Million Two Hundred Seventy-Five Thousand Dollars), plus interest at the rate of 9% per annum from the date of entry of this Judgment until paid, and that Plaintiff shall have immediate execution thereon.

**ENTER**

Dated: New York, New York
~~December~~ , ~~2013~~
January 8, 2014

Honorable William H. Pauley III
United States District Judge

2